George Carpinello Boieschiller Flexner for the white objectors in this case. I'd like to reserve five minutes of my time for rebuttal. Your Honors, this appeal has its origin in the 2009 ethical breach of the Settling Council when they attempted to coerce the class representatives to approve the settlement by offering them  representatives of the class. This court in Radcliffe 1 held that that was a clear ethical violation. It created a conflict between the representatives and the class, and it was so egregious that it necessitated the reversal of the settlement in that case. On remand, the issue then became whether the settling council who had committed the ethical violation or white council should be appointed as class council. In that context, the Settling Council made an offer that they would accept the cost of the new notice, recognizing that because the first settlement had to be scrapped, $7.5 million were spent in administrative fees to send out to the class, and that new notice would have to be sent if there were a new settlement. The Settling Council told- When was that offer made? That offer was made before the district court during the oral argument as to whether settling council or white council should be appointed. And this court specifically noted, as did the district court, now let me quote this court, what this court said. The district court, quote, noted that Hernandez Council, that is the Settling Council, had taken extraordinary steps to neutralize the effect of the ethical violation, including, important quote, agreeing to accept the cost of re-notice. Now, if Settling Council had done that and had agreed to pay the cost of re-notice, either by out of their pocket paying the cost of re-notice or saying to the court, deduct the cost of notice from whatever reasonable fee you determine, and then deduct the cost of notice, we would not be here. There would be no problem. So you're saying they should have taken the $8 million fees and deducted $6 million from it? No, no. I'm saying that whatever fee the court determined, and the $8 million was kind of the district judge's compromise because he took something off the fees. Taking something off their fees afterwards, of course, does not resolve the conflict. Because the conflict was that they went into the negotiations in a conflicted status. They didn't actually make an offer to pay the $6 million. They made a conditional offer that we'll get the class, we'll try to get a settlement that is equal to the $6 million that we have taken from the class. That created an inevitable conflict. Because if we send it back, we'll have to send $6 million more to notify the class again. Well, it is true that having committed an ethical violation the first time and having been given a second chance, they committed yet another ethical violation. It's as if, Your Honor, it's as if a class counsel had said to the class, I guarantee you that we'll get $20 million in this case. I think somebody could look at this and say the big mistake was made in certifying a class so large it will take $6 million plus each time you send them a notice. But neither here nor there, what do you want us to do? I asked the court to reverse. And as Radcliffe Warren held, that this class settlement is infected by a conflict, a clear conflict, because the settling counsel had a clear financial interest in the outcome. As I was about to say, whenever counsel puts their own financial interest into the mix, they are clearly conflicted. And what settling counsel actually said, and they admitted this, was we're not going to pay the $6 million. We're going to make the class pay the $6 million. We're going to take $6 million out of the fund, and we're going to try to get the defendants to come up with $6 million more, which they didn't do, by the way. Which they didn't do. But every dollar that they get from the defendants belongs to the class. It doesn't belong to them. Well, let me just play out the practical consequences of this. So if it goes back, what if the current class counsel were to be substituted with someone else? That wouldn't necessarily defeat their claim for attorney's fees, would it, in terms of what they had done to date? I think if it goes back, if new counsel is appointed, and there's either a settlement or a trial, the district court will then determine, did the settling counsel add anything to the case, and should they get some share of the resulting fees? Recognizing, of course, that they had now cost the class $13 million in notice costs because of two ethical violations. And the class, conceivably, could have a claim against them for having, A, wasted $7.5 million, and now $6 million. I think it's critical. Well, but I think I asked a more simple or simpler question. And that is, just hypothetically, if the class counsel were to be substituted, it wouldn't mean that they wouldn't be eligible for some portion of fees for their contribution. That's correct. OK. And if that were to happen, then there will, as Judge Ferris said, if there's a renegotiation of the settlement, there will then have to be a re-notification of the class, correct? Correct. Which appears to be around $6 million, according to all the records. Correct. OK. But I think it's important why we have to go through this process. It's critical to explain why we have to go through this process. But we understand that. OK. Well, let me go back to my original example. It's as if, let's say class counsel had said, I guarantee you that we will settle this case for $20 million, and I will make up the difference. That attorney is now conflicted. That attorney could not, in good conscience, represent that class in negotiations. Because let's say, for example, that a unconflicted attorney would recognize that, really, $10 million was a great settlement. That attorney is not going to settle for $10 million because they now owe the class $10 million from their guarantee. These people owe the class $6 million. And they were under the burden. They were on the overhang of trying to come up with $6 million. Now, they obviously didn't do that. If the revised settlement monies were significantly in excess of what the prior settlement was, would we be here? Yes, we would. Again, because you cannot cure the conflict. And Judge Carter tried to do that when afterwards, towards the end, he said, I'm going to take a couple million dollars off your fees. That doesn't cure the conflict. Because the conflict was that when they went into the negotiations, they were conflicted when they went into the negotiations because their goal was not to get the best for the class. Their goal was to get out from the $6 million commitment. And you can see this because when the negotiations started after the remand, there was $37.3 million in the bank. That's what was left over from the first settlement, less administrative costs and notice. When the negotiations ended, and at that time, when they started negotiations, Settling Council had a $6 million obligation to the class, which this court quoted, a $6 million obligation to the class. When the negotiations ended, Settling Council, in their mind, had a zero obligation to the class. And the class had $32.3 million. You know what else? If you go through the figures, the numbers before this last round of litigation, there was more money available to the class than there was after it was concluded. Isn't that true? There was more money in the first? Yes. Yeah, if I understand your question, Your Honor. In other words, the amount of money available to the members of the class was here. It's going down. And now, if we do what you want us to do, it's almost certain to go down more. Does that make sense? That depends on what happens. We may go to trial. And as Judge Carter said, the case, as Judge Carter said, in this case, is the defendant's liability is literally in the billions of dollars, which is the whole other issue is the inadequacy of this settlement, where they're paying less than a penny on the dollar. Which also has to do with somebody's opinion that maybe this class was too large to have been certified in the first place. But it's done. And nobody, no way on the, the appellate court doesn't make that determination. The determination's already been made. But when you look, what I think we have to do is we look at you before us today, see what is happening to the class. Because that's who ought to get the money from the settlement. And what we see is that the amount of money available is being dissipated. Well, no, Your Honor. I disagree. Because literally, there's no money. The class has, the class absent, the class has no money. This is money the defendants put in the bank as a result of a settlement that was determined to be invalid. And then they added another million dollars. The defendants added $1 million and put that in the bank and said that's also available. But if we go back and the settlement's out, we're back to square one. We have, we're back to square, we're back to the beginning of the case. And if, other than the discovery that's taken place, we have new counsel appointed, and we try the case. The class never literally had the money. All that we know is that this settlement doesn't give them, all we know is that these settling counsel took, literally took $6 million from the class to pay their debt. And we know they were conflicted because we look at the result. The result is that they have $5 million less than they would have had under the original settlement. And they have to come up with some way to say, we got our $6 million, so what do they do? They come up with all kinds of gimmicks which weren't part of the first settlement, like a free credit report, which Judge Carter, in this case, said, had absolutely no value in his decision in the Acosta, when the Acosta class tried to get certified. He says, that has no value. How'd they come up with this value for the website? Exactly. That's the latte value? Exactly, Your Honor. The double latte. It's worth a couple lattes. It's worth two lattes. They write a brochure. They write a brochure which has no market value. If they wrote, if they wrote and created a website and said, you can read about credit scores and everything by paying $10, how many people would literally sign up? They got 50,000 people to sign up from the class. I think 71 people used it. I'm sorry? I think 71 people used it, right? Well, there was more than that, but they didn't tell the people who opted for that instead of the money that they could get a free credit report anyway. They get three free credit reports from each of the defendants. So what, so, so then, so they write a brochure, they put it on a website, and they charge the class literally $2 million for that product. Literally. Because that's $2 million less they have to now put in. And then, they're still not up there. They're still, they're still only at $3.5 million. They got to come up with six. So in, in the opinion they write for the judge, never discussed in the hearing, never raised by the judge, in the final order by the judge, in words they wrote, they assigned a $2.5 million to the first notice, which was invalid. And clearly inconsistent with this court's decision. They assigned, they charged the class $2.5 million for the first notice. Can you explain that to me? I was having some trouble understanding what the practical essence of that was for the class. It has no practical, well, the practical effect for the class is, is that they didn't have to reach in their pocket and pay $2.5 million. But what it, what is it purported to do for the class? It's not, it's not explained. It's not explained. Now they do argue. I'll ask them. They, they do argue that we got more people in the second notice. Well, that's not surprising. When you set out a whole several million notices, you're going to get more people. But the main reason they got more people is because they cured the defect that we told them about in the first class. When they sent the first notice out, they, contrary to what we had urged the judge to do, they required the members of the class to certify that an incorrect credit report had been issued. Most people don't know that there's incorrect credit reports. They have no idea how their score is valued. And we said, you make people certify to that. No one's going to certify to that if, if under, if they, if they're not sure that that's in fact the case. So in the second notice, the judge and settling council did what we said they should have done the first time. And they took it out and they got more people. Big surprise. But why should the class have to pay $2.5 million for that? The bottom line is here, your honors, is they recognize, Judge Carter recognizes, no one has disputed anywhere in their brief, they had a $6 million obligation to class. They should have paid it. They should have said to the judge, whatever reasonable fee you determine at the end of the case, take off 6 million. Or they should have said to the, they should have paid the mailing out of their own funds, out of their own pocket, we wouldn't be here. But instead they said, we're going to take the 6 million from what we can get from the class. We're going to literally take the class's money. We're going to make the class whole by negotiating with the defendants. Every dime they got from the defendants belonged to the class, not to them. If they got a better settlement, that should have gone to the class. They owed the 6 million, not the class, but they charged the class the $6 million. They couldn't get it from the defendants. Then why did Judge Carter approve the settlement if you keep mentioning these issues that he has raised with the conflict and the problems? Your honor, I think in all fairness, I think Judge Carter wanted the case settled. And I also have to say in candor that Judge Carter felt that the injunctive relief that the class got in 2008 was enough. And he felt, he actually literally said that he thought in some instances the class was unworthy because some people weren't harmed, as he said. Everybody is harmed as a matter of law. Under Spokio 2, everybody who has an incorrect credit report is harmed and- Well, let's just say that that issue is still percolating in the courts. Okay, but their own expert, their own Alzheimer, their own expert, which they've cited several times in their brief says clearly people are harmed by an incorrect credit report. And it doesn't matter whether the score goes up and down because you can't get a mortgage with a charge off on your credit report. They're clearly harmed. They're harmed as a matter of law because it's an incorrect, it's like a common law defamatory claim. But as a practical matter in their pocketbook, they're harmed. And the insidious thing is most of the people don't even know it. Do you want to say very many? Yes, I do, Your Honor. Thank you. Good morning, if it pleases the court. I'm Paul Bland of Public Justice. I'm here representing the Hernandez plaintiffs in the case. Mr. McClune, who represents one of the defendants has five minutes of our time, but he has generously said that if the main issues are ones relating to these issues of representations and ethics and so forth, I should take it all. He's here to say essentially the case isn't worth a billion dollars. So we've heard 10 times or 20 times there that we allegedly represented to the district court that we would pick up the $6 million cost of the original notice. What we said to the district court on this remand was when we go back and look at the record, that's not what we said. We made several commitments and I'll describe what those commitments are in a second. But if the court believes that we did make a commitment to pay the entire cost of the notice, then the court should reduce our fee by that and we will not appeal that. Set it in court, we set it in pleadings. We said, so we don't agree that we made that commitment. We made different commitments and we'll set those out. But if we did, then- So let me just understand what you just said. Yes, please. The amount of fees that I see now remaining are about 8 million? Yes. So you're saying, if I heard you right- Yes, if the court feels that the- That there was a mistake or some conflict, you would just take the eight minus six? Well, I think that you should let the district court figure out what the cost of the first notice was and I'd like to- Okay, well, let's just, whatever that may be, X. Right, before the court would strike down the settlement and have our clients who've been waiting for 15 years, 900,000 of whom have gone through this process, before the court would remand and say, start the whole thing over again and see if they can get a billion dollars and have 900,000 people who want their money just wait and wait and wait to see if they can do it and have this case proceed forever. If the court believes that we made that commitment, then instruct the district court to approve the settlement and just shift whatever would match the commitment from attorney's fees to the class. Well, after Radcliffe won, when you're remanded, there's a conflict. At that point, you could have been punted off. And it says Judge Carter's opinion and this court's other panel definitely factored in both of their statements in allowing you to stay on that you were doing this magnanimous act of agreeing to pay for this second notice, correct? Yes, so the court, the district court on remand found that the conflict was inadvertent, brief, and cured and this court approved that in Radcliffe too. Also, the court then said that it was appropriate to have the 23G motion to have the Hernandez Council be class counsel for two reasons. One was that they had taken a number of extraordinary steps and one of those steps that was listed was the cost of re-notice. And I'll talk about where that comes from. It was a factor that they used in their analysis of saying you can stay on board as this, right? Yes, and that the language, the cost of re-notice came from language in Judge Carter's opinion. And so on remand after that, and they made an argument which has been repeated here as if the second panel didn't exist, which is that because there was supposedly this conflict over the notice that we had to be barred and be thrown out completely and this court did not accept that. You've heard like four minutes that's essentially asking you to overturn Radcliffe too. But let me, if I can talk about what the commitments that were made, Your Honor. Please. So there were three commitments and Judge Carter goes through them and this was briefed extensively and his findings of fact, you know, you're being asked now to essentially decide what commitments were made in lengthy court hearings on remand where he's made findings of fact that should be looked at for abuse of discretion. But there were three commitments. The first was that we were asked a hypothetical question. If there is no settlement and the case just continues in litigation, the class will have to be notified. Would you pay to re-notice the class if that happens? This was a question that was asked back in 2013. So if there was no additional settlement, we said yes, we would pay to re-notice the class. That hypothetical never came true. This is not a counterfactual, like what would have happened if the Germans won World War II kind of situation. We know what happened. That didn't happen. The second commitment that was made was, and Judge Carter states this very clearly in his order. The commitment was that we would make sure that the class was not harmed, that the class was in no way punished by the ethical mistake that was made in 2009. This class has not been punished by the ethical mistake in 2009. Judge Carter goes through and evaluates the current settlement pending in front of this Court in great detail, provision by provision by provision, and makes factual findings about what the value of each of those terms is. And what he finds is, is that the settlement is actually better than the previous class, than the previous settlement from 2009. The settlement is larger and better for the class. And he gives several reasons why that's true. The final commitment was, there was a notice that was given to the people who claimed actual damages. And the people who had actual damages claims, there was no attestation requirement originally. And then what happened is a ton of people made claims. So the defendants objected and said, well, we think there are too many claims here. So the claims administrator went back and questioned a number of people, and they found that there were a lot of false claims. So then there was an additional notice that cost $567,000 to go back to the people who'd made attestations and say, you're gonna have to come, or who had made actual damages claims, and you're gonna have to come with more information. And Judge Carter said, well, this is, you should have known that there were gonna be false charges and there were gonna be mistakes. I think you should pay for it. And we agreed. So we paid for that. Those are the three commitments. Now, the thing that he's talking about, which they argued with unbelievable energy and high volume and so forth to the district court again and again and again, Judge Carter spent hours going through the record, going through the transcripts of hearings that he'd conducted that go back years, and he found they just simply never made that. And what he, there's a particularly a finding of fact that said, counsel here mischaracterized the commitments that we made to the court. And what's happening here is, rather than deal with Judge Carter's finding of fact that they mischaracterized hearings that Judge Carter presided over, which is subject to an abuse of discretion review, you're just hearing basically told again and again that this is what happened. So where in the record would we look on that finding of fact to say, you're saying that the mischaracterization is the commitment to pay the re-notice cost? The care, yes, the care. Well, so the re-notice costs that were, the commitment that was made around re-notice was in connection with a hypothetical around the, I'm looking for my notes about the sites of the records. I'm sorry to be shuffling papers while you're talking. The commitment was in response to a hypothetical question. Having trouble finding, we set out in our brief and Judge Carter sets out in his opinion that the opinion that's being appealed from the exact sites to each page of the record where the three different commitments were made. To cut to the chase, your argument is there was no commitment to pay the six million re-notice cost? Right, we believe that there was not. I described what the three commitments that were made, not the penalized. Why then does everyone go through the gymnastics of trying to make the settlement look like it's equal or better? Well, the settlement, I don't believe that they're gymnastics. I don't believe we're engaged in something dishonest that Judge Carter is making things up to nail this down. But that's kind of where everything is being characterized to try to make it come out whole, so to speak. That is how they are characterized. I don't believe that that's a fair characterization. Can I go into some of these items? Sure, please. So for the $2.5 million from the first notice. So everybody gets a notice and then there's administrate. You know, it's only part of the cost is the cost of notice, then part in postage. And part of it is administration. So there are 900,000 people at this point who made claims. 78% of those claims resulted from the first notice. So of this 900,000 people, you know, all but 22% of both the actual damages. Are those for cash settlement? Yes, all of these are cash. So there's like 50,000 in the actual damages. 78% of those were made as a result of the notice and the administration from the first settlement. Then there's the remaining of the 900,000 are from the convenience claims, the $20. And all of those are, 78% of those are from the first notice. So Judge Carter said the first notice was not without value. This isn't Staten versus Boeing where there was the exact same notice twice. The first notice actually reached a lot of people and he said he was conservatively valuing it $2.5 million. And this idea that we wrote this and Judge Carter is some automaton and we were like pulling the strings on, you know, this person's been on the district court for many, many years is crazy. We had a court hearing in front of him in which we proposed an order and Judge Carter came in and we spent most of a day and Judge Carter's a very powerful, forceful presence. And he said, I am not happy with this, this, and this. And he gave us a ton of guidance. And unlike some people, we actually listened to Judge Carter and respected him. So when he gave us very clear guidance of what he wanted, we went and rewrote the order based upon his guidance and then submitted to him another order which had tons of his language and ideas in it. And then he changed that and he tinkered with a number of provisions and changed it. He didn't just. May I just ask you though, the fact that some of those notice costs might've been valued doesn't change the fact that there were 6 million of additional costs, does it? So in the second settlement, there were some additional notice costs, but they were lower for a variety of reasons. Were they 6 million? The total costs are gonna be less than 6 million for notice in the second settlement. Is that a ballpark figure though? It's a little high, but it's, I mean, it's not that far off. Plus or minus. But I guess my question is this, it's not just one of arithmetic, but the fact that first notice went out and garnered some subset of people who were able to make monetary claims, I'm not quite sure how that dissipates the fact that you still, because there's a second notice, you have to pay extra money. So there is some additional money that's spent out of the second notice. And that's more or less six plus or minus million. It's gonna be minus one or two, but I'm not sure the exact figure. Okay, but some number. But there's gonna be some additional costs. And so one thing that happened is that there's an additional million dollars from the defendants. One thing that happened is Judge Carter reduced the attorney's fees by $2.8 million from what they were in the first settlement. So the load star for counsel is much higher. You now have a negative multiplier, but nonetheless, Judge Carter reduced the attorney's fees by just a little south of $3 million. Then the original settlement notice did have some value to the class. And then the injunctive relief, I would like to push back, respectfully, if I may, on the idea that this is fanciful and was made up by the district court. We put forward an expert who testified to that the injunctive relief had significant value in a lengthy declaration. Opposing counsel offered no, the objectors who wanna say it has no value had no witness, they have no expert. And then they don't even bother to depose or question our witness. They sit there silently in hearings while the testimony is described and argued about and discussed in front of the district court. And then the district court finds, as a matter of fact, that settlement website was really valuable and our expert goes through what the elements are of that and how it is useful and how it provides information that people wouldn't otherwise have been able to get. And several hundred thousand people thought it was useful enough to go to. And then with respect to the two credit scores and the credit report, which are tailored in ways for people who are trying to improve your credit. So yes, you can get one free credit report on your own. But if you're having problems with your credit and you're trying to fix it, it's helped to be able to get three credits, to get several credit scores in a row, excuse me, credit reports, but then also get the score. So you can see whether the actions you're taking improve your credit. So now, opposing counsel- Is it something that they could all, that anybody can do though? Can't anybody- Hey, you can only get one score. You can only get one report and you don't get any scores without paying. The vantage scores cost money. And so our expert actually points out that to get this product from a company who sells it costs at least $20. Moreover, 50,000 people had a choice. Would you want the $20 or more in the convenience charge, convenience fee, or would you prefer to have this relief? And 50,000 people said that they thought that the two scores and the report were more valuable to them. And so while opposing counsel is sitting here paternalistically saying, oh, well, 50,000 people are rubes who did this stupid thing and they all got nothing for their value, there are 50,000 people who thought that this product would actually sells on the market for $20, had value. So when Judge Carter goes through a lengthy analysis and he assigns economic value of $3 million, which he describes as being conservative to the non-monetary relief, I think that to heap scorn on his factual findings here based upon a few minutes of oral argument seems very unfair. There was expert testimony. Judge Carter had a valid reason for reaching that figure. It's not illusory and it's not pulled out of the air. Before you sit down, what do you want this court to do? I think that just simply affirming Judge Carter's order. I think that the settlement is fair, reasonable, adequate. It's an improvement over the previous settlement. And I think that the truth of this is this is not gonna be a billion dollar case. If the settlement is thrown down, the case ends up being litigated, there is enormous litigation risk. And so I think that the settlement should be approved as fair, reasonable, and adequate. And alternatively, the $6 million plus or minus be deducted. If the court feels that either we, I'm sorry, I interrupted you, Your Honor. But that's your alternative pitch. So the alternative would be, it's not a happy pitch, but the alternative would be, if this court finds that we made a commitment to pay the cost of the first notice, or if the court finds that even if we didn't make a commitment, they were legally required to do it, and it's gonna create new law to say that, that there's now a new ruling that says, a ruling of law that says that whenever there are two settlements and the first settlement falls through because of an ethical issue, that you can never, that the counsel always have to pay the cost of the notice from the first settlement. If the court's gonna have a rule like that, then what the court should do is approve the settlement, but give instructions to Judge Carter to adjust the attorney fees by the amount of the first notice, beyond the $2.8 million. Well, if that were to happen, I'm just talking hypothetically, it wouldn't be a rule so much as it would be an interpretation of obligations in this case. Right, well, actually, I think that the truth is, is that while the white objectors say that there's like a flat rule that, of course, this has to be true, none of the cases they cite come within a million miles of saying that. I understand that. So, and I also think it's very hard to figure out exactly how you would define a rule that's not gonna just pour back into the facts of this case. And I do feel that we're coming here with a very detailed, robust set of factual statements from the district court. And your position about this not being any kind of billion dollar case includes all of those defenses that you don't think they'll be able to overcome in bringing forward this class, right? Let me, Your Honor, I think that we should be able to overcome them. I mean, I think that the willfulness issue, it's a very serious defense. So when the Safeco case first came out, many of us who do appellate work in consumer law looked at that and said, we actually think this favors us. I have to be a realistic man and see that, a realistic lawyer and see that there are a lot of good cases that have been thrown out that I think shouldn't have been. So there's a huge risk there. I do not want to represent to the court that I think that we have a losing case and we're here with our, you know, beaten. This is the second largest Fair Credit Reporting Act settlement in the history of the statute. This is not a negligible settlement. The other, but the thing that I think is particularly risky, and when they described this as a billion dollar case and said it's simple math, you just take the number of people and you multiply them by $1,000. Is it proof? Is it the proof issue? No, I think that the, well, it's proof with respect to class certification. So Judge Carter, back in 2009, issued a tentative decision which denied class certification. It's extremely lengthy. And it has a series of proposed findings of fact. Now, if this was a, if we lived in a world in which I could show up in the Ninth Circuit and just give my opinions about the facts, he's totally wrong and the case should be certified. And in fact, a number of the final points that the counsel made about how everybody was harmed, I think, I personally think are right. But if we live in a world in which you come to the Ninth Circuit and you are burdened down with, you can't overturn a factual finding to district court unless it's abuse of discretion, if he enters a decision that he tentatively set out to deny class certification, we are in a world of trouble. And so I think that there's a lot of things in that that are wrong. When we went back on remand after Radcliffe II, we'd listened to Judge Carter and we attempted to propose two much more narrow classes that would have been much easier to certify and would have led to, I think, to a much better result. And we wouldn't have had, because Your Honor makes a point, this is a very, very large class. And I think that is a problem in growing in class action. At this point, it's the putative class, given the ruling. I'm sorry, yes. Well, since to the extent that we have a settlement class that Judge Carter certified. You have a settlement class. I think it is a class. But I would say we had proposed a much more narrow class and Judge Carter on remand refused to allow us to amend the complaint to do that. And he said, this case has been going a really long time. I'm not gonna allow you to amend the complaint. So we would be in a situation, in order to get a class that we could certify, coming up and appealing Judge Carter on a scheduling issue. And I think that I would have preferred to see Judge Carter allow us to amend the complaint. We would have had narrower classes. They'd have been more certifiable. They'd have been stronger. This would have been, I think, that would have been great. But the court, I think, has a strong argument that he's within his rights in controlling his dock and in issuing a scheduling order. So some of the imaginative views that come from the other side about how this is a billion-dollar case. You just multiply it all out. There's not sort of a terrific respect that the district court actually has some power and some decision-making authority over what facts the court's gonna enter and how the court's gonna control its own schedule. And so I do think in a perfect world, I don't think that this is, I think this case should be a perfect world, much larger. When it would go back and go to trial, basically all the settlement would be off the table. That's right. And Judge Carter would go back and re-examine or you all, he would need to finalize the class certification decision. So the 40 depositions that have been taken, the hundreds of thousands of documents reviewed and all that, we would be back into discovery. Or if you throw us out because you sort of overturn Radcliffe II and you disqualify us as we're being asked, then everything's back on. If the district court just denies class certification, then there's not, you know, there's gonna be a trial for six people. And then we'll be back here challenging the order on class certification. But then you're gonna see the 900,000 people. Which, as you say, is tough to do. The 900,000 people are gonna end up not getting money in all likelihood. Now we would fight like crazy. We're not, I'm not, I do not come in and say, we agree that this case doesn't have value. But realistically, the risks are huge here. And you have 900,000 people who've, after 15 years, would like to have their money. The idea of throwing this case out because there's, we imagine, we supposedly made this commitment that Judge Carter said we didn't make so that this case can proceed. At 15 years, we're just getting started now, you know. This case can't be resolved until it's, you know, old enough to drink. I don't know what it would take for them to be happy with how many proceedings you would have. But our class would like to actually have a settlement in which they receive the relief that they've asked for. Thank you. Thank you. Did you want to add anything? Your Honor, I. Please. I don't want to preclude your opportunity. I think Daniel McLoone, Jones Day for the Defendant Appellee, Experian Information Solutions, Inc. You know, our role, and I think the court has seen our briefs, is to emphasize the points that counsel was just addressing. How many litigation risks this class faced. I think the most significant one was the risk that the class wouldn't be certified. And if you just look at the appellant's briefs, the number of arguments that they had to address. They make arguments. Some courts might adopt them. Some courts might not. We think we had very powerful responses to all of them. But in order for this class to succeed on a litigation basis, they have to prevail on every single one. And the risks, as counsel just pointed out, to the class are huge. So what the court had to decide in deciding whether or not this settlement was fair, reasonable, and adequate for the class was given all of those risks, is this really a billion-dollar case? And I don't think it's really arguable that it's anything close to a billion dollars. There are such large problems with the manageability of this class. As Judge Ferris pointed out, it's a huge class. And trying to address, you know, even within the settlement, class members fell into different categories. Some people had applied for mortgages. Some people had applied for jobs. Trying to figure out, you know, 15 million people, how they would allocate some judgment that got entered would just be a huge manageability problem. Now, the appellant's response in the reply was, well, there's no problem certifying this class because Judge Carter certified a settlement class. But of course, that's not true. The criteria and the evaluation when you take a liability determination out of the Rule 23 analysis is fundamentally different. For settlement purposes, the defendants have chosen to take the liability question out of the class, the Rule 23 analysis. But in a litigation context, of course, we would be heavily disputing that. I appreciate the time is almost up, but the other points that I think we raised, and just to repeat them briefly, they're in our brief, that there will be a huge problem establishing a willful violation. Even if you conclude that our procedures weren't reasonable, in order for the class to succeed, they have to prove willfulness. And the Safeco decision clearly sets a pretty high barrier. Now, they think they can clear it. They say they can clear it easily. But we think there is a real issue on that point. And Judge Carter took three days before issuing a tentative ruling denying our summary judgment on that point. It is a close question, and the case law that has evolved since this settlement have largely favored, have been much more favorable for the defendants than they were at the time the settlement was reached. So the question of being able to establish a willful violation when there was no clear authority addressing the situation. Let me just explain briefly what the particular circumstance was. Never in the history of credit reporting industry was a credit reporting agency held responsible to take one piece of information reported from one reliable source, viewed as being reliable, and comparing it to other information being reported by another reliable source and trying to figure out if there's some conflict between them. That concept had never been imposed on a credit reporting agency by any court. And it was something that we chose voluntarily to do as part of the injunctive relief settlement, which is part of the reason that Judge Carter said the injunctive relief settlement was so monumental because it was doing something that had never been done by the industry before and never been required of the industry before. But in order to get a willful violation, the plaintiffs would have to persuade the trier of fact that it was obvious that we had an obligation to do something that had never been done before. And I submit there is a huge risk that the plaintiff class would be able to prevail on the willfulness point. No willfulness, no payment to any class member if we're gonna litigate the case because it would really be impossible because if it was only a negligence claim, you'd have to prove individualized damages. You wouldn't be able to rely upon statutory damages. So as a practical matter, if they can't prevail on willfulness, there's no recovery for anybody in the class. Thank you. I think we have your point in mind. Thank you. I beg the court's indulgence that I have a moment to respond to the merits argument just made, as well as Mr. Bland's point. First, don't take my word for what the case is worth. Judge Carter said it's a billion dollar case. We're not saying that's what it should settle for, but he acknowledged that the potential damage was in the billions of dollars. With regard to willfulness, I ask the court to- That's true if you get past liability. Yes, on liability, on liability, I urge the court to read Judge Carter's own decision denying the settlement in the Acosta portion of the case where he discussed willfulness and his denial of the motion to dismiss by TransUnion where he addresses willfulness. Why is it willfulness? Because Judge Carter cited their own expert who said they knew that they were not accurately recording bankruptcies. Why? Because the survey done by Mr. Jantika showed that 65 to 75% of their reports on bankruptcies were inaccurate and they knew it and they decided not to do anything about it. Judge Carter said that. With regard to the argument about what Mr. Cadell promised down below, our case is not about a breach of a promise. Mr. Cadell was very careful. We acknowledge Mr. Cadell was very careful to make a contingent promise, but that's the problem. He made a contingent promise. He said, we'll make up the difference if we don't get it from the defendants. That caused the conflict. They were under- That's why you're wrong. He said, why all the gymnastics to get the six million? Because they told Judge Carter, if we don't get it from the defendants, we'll reach into our pocket. That caused the conflict. So they had to come up with some cockamamie group of bennies, like a brochure that they charged the class $2 million to come up with the six million because they knew they had to reach in the pocket. What would be wrong with just charging? Go ahead, Judge Ferris. No, I was about to say on television, certain amount of histronics carried the day, but in this court, we're going to decide this case on the record. Yes, I agree, Your Honor. And if I can quote to the record, Your Honor. This is Mr. Cadell to Judge Carter. You asked where this was. It's in the record at 653, ER 653. If we can get a bigger settlement or bigger settlement, we will. If we decide, however, that the settlement is in the best interest of the class and because of current state of the law or whatever, and we can't get additional money, then what I'm telling you is, Your Honor, we will not penalize the court. Then he says class. If that means we will reduce our attorney's fees, then we will do so. That was the contingent promise. If we don't get a settlement of six million or more, we're going to reach into our own pocket and deduct it from our fees. And that caused the conflict. And you can't cure a judge by reducing six. You asked my adversary, how about if he takes the $6 million off the eight? That doesn't cure the conflict because they negotiated a settlement with the conflict overhanging them. That can't be cured. Even if they got $100 million settlement, they were in a conflict situation. As the example I gave, Your Honor, just fair as before. If you put your own financial stake at issue in the negotiations, you are conflicted. They were conflicted. This is not what Mr. Bland keeps misrepresenting what our case is about. It's not a breach of the Cadell promise. It's the Cadell promise. The Cadell promise caused the conflict. He says the class was not harmed. How was the class harmed? Because they took $6 million of the $37 million that was sitting in the bank and they paid, they used it, they're using it to pay the notice cost. That was the class's money. Problem, well, I don't know. One problem is usually in matters of this sort, the trial courts are in a better position to resolve the conflict than the court on appeals. Do you think that's true? Not here, Your Honor, because it's an issue of law. It's not a question of fact. What specifically is a question of law that is before us? Whether what they did, the promise that, the contingent promise that they made created an inevitable conflict in their representation of the class. That's a question of law. There's no factual issue here as to what happened. Contrary to what Mr. Bland said, we don't disagree with the facts. Mr. Cadell said what he said. And his statement and his promise and his commitment that this court held in Radcliffe 1 to accept the cost of notice created the inevitable conflict. And they could not possibly act in a disinterested way having made that commitment. You know what, I can just speak for one third of the court, but the argument you're making sounds to me all the more reason why we should resolve it, that there's no need to send it back because as you've just said, the question is purely one of law and not of facts. And we ought to resolve it here. Yes, and I think this court should declare once and forever that these counsel are conflicted and should not be reappointed. Well, I know you're telling us what we should rule. I'm saying we should rule. And that's one of the questions, whether they were. Yes, and I think, and again, I say, I think it's in a net, the ethical rules have said forever that a lawyer should not have a financial interest in the case. These lawyers had a $6 million financial interest in this outcome, and we saw what happened. We actually saw the result that this is a case where the conflict wasn't, we actually saw what happened because they came up with three non-monetary benefits, which when they first settled the case were not, they didn't talk about free credit reports because they told the judge they were worthless. It's on the record. They told the judge credit reports are worthless. They didn't come up with a website and charge the class $2 million. None of those appeared in the first settlement because they didn't have to. But they had $6 million debt to the class, so they had to come up with these non-monetary things because they weren't going to get them from the defendants. Thank you. Thank you, Your Honor. Thank all counsel for the argument and also the extensive briefing. Case of Radcliffe v. Hernandez v. Experian is submitted and we're adjourned for the morning. All rise. Thank you. Court for this session stands adjourned.
judges: Farris, McKeown, Kendall